UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

      v.

ARDARIES HARRIS,
JORDAN FOX,
ROOSEVELT VEAL, and
XAVIER HARRIS

Case No. 24 CR 236

Judge Andrea R. Wood

## GOVERNMENT'S *SANTIAGO* PROFFER AND MOTION TO ADMIT EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(E)

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:     */s/ Emily C.R. Vermylen*
         EMILY C.R. VERMYLEN
         STEPHANIE STERN
         JALAN JASKOT
         Assistant United States Attorneys
         219 South Dearborn Street, Fifth Floor
         Chicago, Illinois 60604
         (312) 353-5300

**TABLE OF CONTENTS**

I.  Introduction…………………………………………………………….. 1

II. Governing Law……………………………………………………….. 3

   A.  Existence of and Membership in the Conspiracy…………………….. 3

   B.  "In Furtherance of" the Conspiracy…………………………….…… 7

   C.  Alternative Bases for Admissibility of Statements………………….. 9

      1.  A Defendant's Own Statements……………………………….. 9

      2.  Adoptive Admissions…………………………………………..... 10

      3.  Statements for Context……………………………………….… 10

      4.  Other Non-Hearsay Statements……………………………….… 11

III. Evidence Demonstrating The Existence of The Conspiracy And The
Defendants' Participation……………………………………………….… 13

   A.  August 24, 2023 Robbery: Fox Steals a Glock Pistol from Ace's Liquor
       and Tap……………………………………………………………. 14

   B.  November 24, 2023 Robbery: Veal Shoots a Security Guard……… 15

   C.  January 11-15, 2024: Armed Robberies of Six Stores……………. 16

   D.  May 2024: Seven Armed Robberies or Attempted Robberies……… 22

      1.  May 3-4, 2024: Fox, Veal, and Ardaries Harris Rob Two
          Businesses and Attempt to Rob Another…………………… 23

      2.  May 7, 2024: Aradries Harris, Fox, and Xavier Harris Rob Three
          Stores…………………………………………………….….. 25

      3.  May 9, 2024, Fox is Shot During a Robbery…………….….. 30

IV. Coconspirator Statements…………………………………………….. 32

V.  Conclusion……………………………………………………………. 33

The United States of America, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendants Ardaries Harris, Jordan Fox, Roosevelt Veal, and Xavier Harris, and moves for the admission of such statements pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I. INTRODUCTION

Over the course of ten months, defendants Ardaries Harris, Jordan Fox, Roosevelt Veal, and Xavier Harris conspired to commit 15 violent armed robberies of Chicago-area stores and pubs. The defendants—disguised by dark-colored hoods, gloves, and masks—terrorized employees and customers by holding them up at gunpoint; frequently beating them, including with firearms; and in four instances, shooting at employees. The robbery spree ended only after Fox, Veal, and Ardaries Harris were arrested on charges in this case. The defendants are charged in a 23-count superseding indictment with conspiracy to commit robbery; robbery; and use of a firearm during those robberies, including, as to Veal, Fox, and Ardaries Harris, use of a machinegun, in violation of Title 18, United States Code, Section 924(c)(1)(B)(ii), which carries a 30-year mandatory minimum sentence (Count Seventeen). Dkt. 88. Trial is scheduled to begin on June 8, 2026. Dkt. 201-203.

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the conspiracy charged in Count One of the superseding indictment, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with

1

*Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

The evidence concerning the existence of and participants in the conspiracy will include, among other things: (1) cell phone and vehicle location data; (2) physical and forensic evidence, including DNA results identifying Veal, Fox, and Ardaries Harris; (3) ballistics analysis linking a machinegun recovered from Fox during his arrest to certain of the robberies; (4) surveillance and other video evidence from the robberies, including certain statements made by the defendants in the course of the robberies; (5) contemporaneous text and social media communications among certain of the conspirators; and (6) video and photographic evidence from the defendants' and Lofton's phones.

This submission does not detail all of the government's evidence that would establish the existence of the conspiracy or all of the coconspirator statements that were made in furtherance of the charged conspiracy. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracy described in Count One of the superseding indictment and the participation of the coconspirators. As a result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

2

## II.    GOVERNING LAW

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

### A.    Existence of and Membership in the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendants' coconspirators will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the

---

[1] No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant, because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendants and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, United States v. Quiroz*, 874 F.3d 562, 570 (7th Cir. 2017); *Alviar*, 573 F.3d at 540. According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid. 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (*en banc*).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *Bourjaily*, 483 U.S. at 178, 180; *United States v. Harris*, 585 F.3d 394, 398-99 (7th

4

Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *Gil*, 604 F.2d at 548-50. The government need only establish the existence of a conspiracy for an illegal purpose (or for a legal purpose using illegal means) and participation in the conspiracy by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant out of cocaine not hearsay because showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-50; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble,* 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("[I]t is irrelevant when the defendant joined the conspiracy so long as he joined it at some point."). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made.

*United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

### B.    "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, *2-3 (N.D. Ill. Apr. 28, 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *Alviar*, 573 F.3d at 545 (quotations and

citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533;

- to recruit potential coconspirators, *Weiss*, 2025 WL 2476654, at *6; *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *Sophie*, 900 F.2d at 1073-74; *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *Johnson,* 200 F.3d at 533; *United States v. Molinaro,* 877 F.2d 1341, 1343-44 (7th Cir. 1989); *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

8

- to "describe[e] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992);

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994); and

- statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720, 722 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 F. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

### C.     Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy or joint venture are independently admissible and do not require a Rule 801(d)(2)(E) analysis.

### 1.     A Defendant's Own Statements

A defendant's own admissions are relevant to establish the factual predicates for the admission of coconspirator statements against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997). A defendant's own admissions are admissible against him pursuant to Rule 801(d)(2)(A), without reliance on the coconspirator-statement rule. *See United States v. Maholias*, 985 F.2d 869, 877 (7th

9

Cir. 1993). *See also* Fed. R. Evid. 801(d)(2)(A) (providing that a "statement" is not hearsay if "[t]he statement is offered against a party and . . . was made by the party in an individual or representative capacity"). Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See Godinez*, 110 F.3d at 455; *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

### 2. Adoptive Admissions

"A statement of which the party has manifested an adoption or belief in its truth is not hearsay." *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988) (quoting Fed. R. Evid. 801(d)(2)(B)). A party need not expressly state, "I adopt this person's statements as my own," in order for a statement to be admissible as an adoptive admission. *Id.* Instead, an adoption can occur in the course of a normal conversation when a defendant manifests a belief in the truth of another person's statements. *See United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (holding informant's side of telephone conversations with defendant admissible because they were adopted by the defendant during the course of the conversation when the defendant either led or responded to the informant's statements and at no time contradicted the informant's comments or questions).

### 3. Statements for Context

Generally, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential

10

informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id.* at 580 (defendant's responses "would have been unintelligible without the context provided by [the informant's] statements"); *see also United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008) ("A government informant's statements are not admissible under Rule 801(d)(2)(E) because he cannot be a conspirator; however, they are admissible if they provide context or were adopted by the conspirator during the course of the conversation."); *United States v. Fernandez*, 914 F.3d 1105, 1111 (7th Cir. 2019) (questions were not hearsay when not offered for their truth, but to "provid[e] the jury with the full context of [defendant's] prior statements"); *United States v. Norton*, 893 F.3d 464, 467 (7th Cir. 2018) (same).

### 4.    Other Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. Thus, a statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999); *see also United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral [or] written assertion" or "nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of

11

verification, such as an order or a mere suggestion, is not hearsay and does not require Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868*; see also United States v. White*, 639 F.3d 331, 337-38 (7th Cir. 2011) (bank robbery demand note directing victim to "give me the money in the register" and stating "I have a gun" was a command, not hearsay (cleaned up)).

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[3] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

For example, statements made by the defendants during the commission of the charged robberies may not be offered for their truth, but for the fact that the words were spoken and tend to prove the existence of the conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (defendant's statement to a coconspirator that "he was currently out of cocaine" was not offered for its truth, but "as evidence of the conspiracy and who was involved in it").

---

[3] Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

As another example, "[s]tatements introduced to show their effect on the listener are not offered to prove the truth of the matter asserted and therefore are not hearsay." *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022) (citations and quotation marks omitted); *United States v. Tinch*, No. 22-1794, 2023 WL 8433515, at *2 (7th Cir. Dec. 5, 2023) (unpublished) ("The trial transcript reflects that the conversations were used to show not the truthfulness of the statements made by Walton and the undercover officer, but rather their effect on Tinch, through his response and reactions.").

### III. EVIDENCE DEMONSTRATING THE EXISTENCE OF THE CONSPIRACY AND THE DEFENDANTS' PARTICIPATION IN THE CONSPIRACY

From approximately August 2023 through May 2024, the defendants conspired to commit 15 armed robberies of Chicago businesses. The charged robberies typically followed a similar pattern. All of the robberies occurred at night. The defendants operated in groups of between two and four individuals. The defendants were generally each armed with firearms, and entered the businesses with their firearms drawn. Defendant Fox would typically approach the register with a bag and a firearm and would steal the money from the store's cash register and the "drop money," or the overflow money which is often stored near the cash register. Defendants Veal, Ardaries Harris, and Xavier Harris, in addition to a now-deceased coconspirator Orlando Lofton Jr., would take control of store patrons and employees at gun point, robbing them of their cash and confiscating their cell phones. Defendants would frequently pistol whip or beat victims. The defendants all wore masks which covered the majority of their faces, as well as layered, inside-out clothing and gloves. The

13

amounts stolen during a robbery ranged from $0 (three of the robberies resulted in shoot-outs and no money was taken) to approximately $10,000.

Below is a brief overview of each of the charged robberies and the evidence that the government anticipates it will introduce to prove the existence of the charged conspiracy.

### A. August 24, 2023 Robbery: Fox Steals a Glock Pistol from Ace's Liquor and Tap

The robbery spree began on August 24, 2023, when Fox and an uncharged coconspirator robbed a liquor store on the city's northwest side, Ace's Liquor and Tap. Historical cell site for Fox's phone places the phone in the vicinity of the robbery within four minutes of the robbery occurring. During the robbery, defendant Fox stole a briefcase containing a Glock pistol from the owner of Ace's Liquor and Tap. Fox then used this same Glock pistol to commit additional robberies throughout the remainder of the conspiracy, with one key modification—Fox affixed a machinegun conversion device, or "switch," to the Glock pistol, converting the pistol into a fully automatic firearm that could fire multiple bullets at the pull of a trigger.

According to ballistic analysis, ten months after the Ace's Liquor and Tap robbery, Fox fired the same Glock pistol he stole from that store's owner during the May 3, 2024 attempted robbery of Humboldt Haus Liquor and the May 4, 2024 robbery of the Irish Nobleman Pub. Further, Fox was in possession of the same Glock pistol he stole from the Ace's Liquor owner when he was arrested on charges in this case on May 11, 2024.

14

Shortly after Fox robbed Ace's Liquor and Tap, on August 31, 2023, Fox posted a video on his Facebook account showing Fox flashing large amounts of cash. Ardaries Harris appears in the video and refers to Fox as "my homie":



*Aug. 31, 2023 Fox Facebook post depicting Ardaries Harris (left) and Fox (right) with cash*

### B. November 24, 2023 Robbery: Veal Shoots a Security Guard

The robbery spree continued on November 24, 2023, when defendant Veal shot a security guard during the course of an attempted robbery at Super Saving Food. Veal and his uncharged coconspirator entered the Super Saving Food store with their guns drawn. When the security guard tried to wrestle Veal's gun away from him, Veal pushed the guard to the ground and shot him in the shoulder. Veal was wearing white gloves during the robbery and the security guard ripped off one of Veal's gloves during the struggle. That glove was recovered from the store after the attempted robbery; Veal's DNA was found on the glove.

15



*Veal, wearing white gloves, firing at Super Saving Food security guard lying on floor*

Historical cell site for Veal's phone places the phone in the vicinity of the attempted robbery of Super Saving Food within one minute of the attempted robbery taking place.

### C. **January 11-15, 2024: Armed Robberies of Six Stores**

Over the course of just six days, from January 10 through 15, 2024, some combination of Veal, Ardaries Harris, Fox, and now-deceased coconspirator Lofton robbed six stores, as summarized below. Historical cell site data for the defendants' phones places at least one defendant's phone—and frequently multiple defendants' phones—at each charged January 2024 robbery, as set forth below:

- <u>Jan, 10, 2024</u>, Fox, Veal, and Lofton stole $5,000 from A&R Food Mart. Historical cell site for Fox's phone reflects that the phone was traveling in the direction of the robbery within 45 minutes of the robbery occurring. Historical cell site for Veal's phone places it in the vicinity of the robbery within five minutes of the robbery occurring.

16

- Jan. 11, 2024, Fox, Ardaries Harris, and Lofton stole $2,500 from Central Extra Value Food and Liquor. Historical cell site for Fox's phone reflects that the phone was traveling in the direction of the robbery within 45 minutes of the robbery occurring. Historical cell site for Ardaries Harris's phone places it in the vicinity of the robbery within five minutes of the robbery occurring.

- Jan. 13, 2024, Fox, Ardaries Harris, and Lofton stole $6,500 from Buchanas Food & Liquor. Historical cell site for Fox and Ardaries Harris's phones places the phones in the vicinity of the robbery within two minutes of the robbery occurring.

- Jan. 15, 2024, Fox, Ardaries Harris, Veal, and Lofton stole $2,500 from Mr. P Beverage Depot. Historical cell site for Fox and Ardaries Harris's phones places the phones in the vicinity of the robbery within two minutes of the robbery occurring.

- Jan. 15, 2024, Fox, Ardaries Harris, Veal, and Lofton stole $1,300 from Before You Go Liquor Store. Historical cell site for Veal and Ardaries Harris's phones places the phones in the vicinity of the robbery within ten minutes of the robbery occurring.

- Jan. 15, 2024, Fox, Ardaries Harris, Veal, and Lofton stole $3,500 from Clybourn Market. Historical cell site for Fox and Ardaries Harris's phones places the phones in the vicinity of the robbery within five minutes of the robbery occurring.

A chrome revolver used by Lofton during the January 10, 2024 and January 11, 2024 robberies, and then by Veal during the three January 15, 2024 robberies, was found in Lofton's apartment. A black Timberland sweatshirt and black Air Jordan sneakers worn by Lofton during the January 15, 2024 robberies was also found in Lofton's apartment. A pair of gloves that Ardaries Harris stole from Clybourn Market on January 15, 2024 was found in Ardaries Harris's apartment, along with a black hooded sweatshirt with white writing worn by Ardaries Harris during the three robberies on January 15, 2024:

17



*Sweatshirt recovered from Aradries Harris's residence (top); gloves recovered from Aradries Harris's residence (bottom left); Ardaries Harris wearing sweatshirt and holding gloves during robbery of Clybourn Market (bottom right)*

Pictures from Lofton's phone depict the robbery crew with cash and guns. Veal posted similar photos on his Instagram account on January 16, 2024—the day after the three January 15, 2024 robberies.

18



*Photo recovered from Lofton's phone depicting, from left to right, Veal, Fox, Lofton, and Ardaries Harris*



*Photo recovered from Lofton's phone depicting, from left to right, Ardaries Harris, Fox, Lofton, and Veal*

Text messages and social media messages sent by the defendants demonstrate that Veal, Fox, and Ardaries Harris conspired with each other and Lofton to commit the charged January 2024 robberies. For example, in a January 11, 2024 Instagram message sent by Fox to Lofton, Fox asked Lofton, "Freaky [nickname for Ardaries Harris] said uu [you] got some extra gloves and a mask[?]" Fox's message inquiring about gloves and a mask was time-stamped just five hours before Fox, Lofton, and

19

Ardaries Harris robbed Central Extra Value Food & Liquor wearing masks and gloves. Similarly, on January 13, 2024, at 6:21 p.m., approximately 3 hours and 16 minutes before Ardaries Harris, Fox, and Lofton robbed Buchanas Food & Liquor, Ardaries Harris texted Fox, "Grab me a mask before u [you] come get me." Hours later, Ardaries Harris, Fox, and Lofton robbed Buchanas Food & Liquor wearing masks.

In another example, on January 15, 2024, approximately an hour and thirty-four minutes before Fox, Ardaries Harris, Veal, and Lofton robbed Mr. P Beverage Depot, Fox texted Veal, Lofton, and others on a group text thread, "924 n wolcott man man ["Man Man" is Veal's nickname] park there." 924 N. Wolcott is approximately half a mile from a Shell gas station where Ardaries Harris is shown on surveillance video before the Mr. P robbery, and approximately a mile from the Mr. P store.

On January 18, 2024—three days after Veal, Fox, Ardaries Harris, and Lofton robbed three northwest side liquor stores—Lofton was shot and killed as he drove onto the Eisenhower expressway at the Pauline Street ramp. The shooters drove a stolen white Jeep Cherokee with a stolen Florida license plate, a broken rear passenger window covered in black plastic, and an air freshener hanging from the rear-view mirror. The defendants and Lofton used the same white Jeep Cherokee to commit three robberies on January 15, 2024. The white Jeep Cherokee was found abandoned in the parking lot of an apartment complex at 315 Central Avenue in Chicago on the day of Lofton's murder, January 18, 2024. Fox, Veal, and Aradries Harris's DNA was in the Jeep Cherokee. In addition, a navy backpack stolen from a

Mr. P employee during the January 15, 2024 robbery—and containing that employee's birth certificate and other identifying documentation—was in the white Jeep Cherokee.



*White Jeep Cherokee from gas station video surveillance on January 15, 2024, with air freshener and black plastic circled in yellow*



*Recovered white Jeep Cherokee containing Fox, Veal, and A. Harris's DNA, with air freshener (left) and black plastic (right) circled in yellow*

21



*Documents stolen from Mr. P employee in white Jeep*

### D. May 2024: Seven Armed Robberies or Attempted Robberies

The robbery crew went on another robbery spree in May 2024 after adding a new conspirator—defendant Xavier Harris, the younger brother of defendant Ardaries Harris. After Xavier Harris joined the crew, the robberies escalated in frequency and violence, including multiple shoot-outs with employees over an approximately one-week period. Xavier Harris and Veal rotated participation in the May 2024 robberies, with Veal participating in a three-robbery spree with Ardaries Harris and Jordan Fox from May 3-4, 2024, and Xavier Harris participating in a three-robbery spree with Ardaries Harris and Fox on the night of May 7, 2024. Two days later, Fox was shot in the shoulder during an attempted robbery and had to be taken to the hospital, where he checked in under a fake name. On their way to the hospital, the crew fired a shot into the air, and Fox falsely told police that he had been shot at that location—instead of in the middle of a robbery. Ultimately the robbery spree ended when Veal, Ardaries Harris, and Fox were arrested on charges in this case on May 11, 2024.

The defendants used the same stolen grey Nissan Maxima throughout the May 2024 robbery spree. The Nissan was parked in the lot of Ardaries Harris's apartment on the day he was arrested; the Nissan contained Ardaries Harris and Roosevelt Veal's DNA. The robberies from this spree are discussed in further detail below.

### 1. May 3-4, 2024: Fox, Veal, and Ardaries Harris Rob Two Businesses and Attempt to Rob Another.

The robberies picked back up again on the night of May 3, 2024, when Ardaries Harris, Fox, and Veal robbed or attempted to rob three businesses. Fox and Ardaries Harris wore the same outfits to all three robberies, and their robbery outfits were recovered from Ardaries Harris's apartment, including gloves, sweatshirts, and sneakers seen on both men on robbery surveillance video.

The crew first targeted Humboldt Haus Liquor. Fox ran inside first at approximately 10:24 p.m. with his gun pointed at the store manager behind the counter—the same Glock pistol Fox stole in August 2023 from Ace's Liquor and Tap and converted to a machinegun. Fox shot the manager in the hand; the manager fired back; and the three defendants ran out of the store, leaving a trail of blood and shell casings behind them:



One hour and ten minutes later, at approximately 11:14 p.m., Ardaries Harris, Fox, and Veal robbed Gladstone Food Mart. Fox is heard on surveillance video from the Gladstone Food Mart stating, "Lay down. Give me all the money, all the money …. Where the drop money? Where the drop? Where the drop?" Veal stated, "open the fucking register before you die."



*Ardaries Harris (in navy sweatshirt with white stripes) and Veal pointing guns at Gladstone customer*



*Fox pointing Glock pistol with switch and extended magazine at store employee (switch circled in yellow)*

Approximately two hours and thirty-two minutes after the Gladstone Food Mart robbery, Fox, Veal, and Ardaries Harris robbed the Irish Nobleman Pub. Multiple customers, a bartender, a waitress, and the owner were inside the pub when Fox, Ardaries Harris, and Veal ran inside. Fox pointed his Glock pistol with a switch at the people in the pub and stated, "Hands up, hands up. Come here, everybody come here before I drop the switch. Come here. Fully automatic. Come on." Fox made these comments indicating his knowledge that his firearm was a fully automatic weapon in the presence of Veal and Ardaries Harris. The owner ran across the street to his house to call 911, and Fox fired at the owner (missing him) as he, Veal, and Ardaries Harris fled the pub.

Historical cell site for Fox, Veal, Ardaries Harris's phones places the phones in the vicinity of the attempted robbery of Humboldt Haus within ten minutes of the attempted robbery occurring. Historical cell site for Fox and Ardaries Harris's phones places the phones in the vicinity of the robbery of the Gladstone Food Mart within fifteen minutes of the robbery occurring. And historical cell site for Veal and Ardaries Harris's phones places the phones in the vicinity of the Irish Nobleman Pub robbery within five minutes of the robbery occurring.

2. **May 7, 2024: Aradries Harris, Fox, and Xavier Harris Rob Three Stores.**

On the night of May 7, 2024, in the span of just an hour and fifteen minutes, Ardaries Harris, Xavier Harris, and Fox robbed three stores: Buchanas Food and Liquor, El Trebol Liquors and Bar, and Community Food and Liquor. In each of the robberies, Xavier Harris is seen on surveillance video beating innocent customers and

employees with his firearm. Additionally, during the El Trebol robbery, Xavier Harris stole a bottle of Don Julio tequila from the store, and during the robbery of Community Food and Liquor, Xavier Harris stole two boxes containing bottles of Glenfiddich whisky.

Historical cell site for Fox and Ardaries Harris's phones places the phones in the vicinity of the Buchanas and El Trebol robberies within five minutes of those robberies occurring. Historical cell site for Ardaries Harris's phone places it in the vicinity of the Community Food robbery within one minute of that robbery taking place; Fox and Xavier Harris's phones are traveling in the direction of that robbery approximately fifteen minutes before the robbery began.

Less than an hour after the last robbery, surveillance video from Ardaries Harris's apartment shows the robbery vehicle—the stolen Nissan Maxima later recovered parked outside Aradries Harris's apartment, which contained Ardaries Harris and Veal's DNA—arriving at Ardaries Harris's apartment. Xavier Harris climbed out of the Nissan Maxima carrying the two boxes of whisky that he stole from Community Food and wearing the robbery clothing.

Multiple videos following the May 7, 2024 robbery spree depict the defendants counting cash and displaying firearms. Following the spree, Ardaries Harris filmed himself, Fox, and Xavier Harris counting cash from the robberies around Ardaries Harris's coffee table. On the coffee table are piles of cash; a blue money counter; and a Don Julio tequila bottle stolen from the El Trebol store that night. Underneath the table are the two Glenfiddich whisky boxes Xavier Harris stole from Community Food

26

and Liquor that night. Xavier Harris is still wearing the black cargo pants with straps at the knees and black Adidas sweatshirt that he wore to commit the robberies that night. Ardaries Harris narrates the video as Fox and Xavier Harris display their cash proceeds from the robberies. Ardaries states on the video, "the family that eats together [commits robberies together], you know what I'm sayin'." Ardaries Harris further states to someone outside of the video frame, "Don't come down here. I'm handling business."



*Fox counting money (left); Xavier Harris, wearing robbery clothing, counting money with stolen Don Julio tequila bottle on table and stolen Glenfiddich whisky boxes on the floor (right)*

In another video that same night, and posted to Ardaries Harris's Facebook account, Ardaries Harris drank from the Don Julio tequila bottle stolen from El Trebol and flashed a pile of cash. While displaying his piles of cash, Ardaries Harris

27

stated, "I'm stackin' this shit [cash] all summer and all winter." Ardaries Harris and Xavier Harris appear together in the video, both holding piles of cash:



*Ardaries Harris (left) and Xavier Harris (right) holding cash*

Another video from Ardaries Harris's phone from early in the morning after the May 7 robbery spree shows Ardaries Harris at a sandwich shop, wearing a ski mask, pulling a firearm out of his waistband, and holding up a large pile of cash:



*Ardaries Harris holding firearm and cash early in the morning on May 8, 2024*

28

Yet another video from Adaries Harris's phone, early in the morning on May 8, 2024, shows Fox and Ardaries Harris—still wearing masks—at a gas station holding large piles of cash. Fox holds up his pile of cash to the camera and states, "bread and butter." In another video from Ardaries Harris's phone, taken at approximately the same time, also at the gas station, Fox holds up the back of a Glock pistol with a visible switch and makes a "brrrrr" noise, imitating the noise that a fully automatic weapon makes.



*Fox and Ardaries Harris (left); Fox displaying back of Glock pistol with switch (right)*

In a selfie video dated May 10, 2024—three days after Ardaries Harris, Fox, and Xavier Harris robbed three stores in one night—Ardaries Harris displayed cash to the camera and stated, "I make new money every day…. I made 56 hundred [$5,600] today. [$]5650."

29



*Ardaries Harris displaying cash*

When law enforcement searched Ardaries Harris's apartment on May 11, 2024, they found approximately $11,000 in cash; the stolen Glenfiddich whisky and Don Julio tequila bottles; a money counter; assorted firearms, ammunition, and switches; and drivers' licenses and wallets belonging to victims of the May 7, 2024 robberies.

### 3.  **May 9, 2024, Fox is Shot During a Robbery.**

Two days after the May 7, 2024 robbery spree, on May 9, 2024, Fox was shot in the shoulder as he and Ardaries Harris attempted to rob Basil Food and Liquor. Historical cell site for Fox and Ardaries Harris's phones places the phones in the vicinity of the attempted robbery of Basil Food and Liquor within two minutes of the attempted robbery occurring.

Pole camera footage shows Fox outside Ardaries' Harris's apartment after the attempted robbery with a blood stain on his shoulder:

30



Five minutes later, surveillance video from the University of Chicago hospital shows Fox entering the emergency room. Twenty-three minutes after he checked into the ER, Fox posted a selfie photo on his Facebook account showing him in a hospital bed with a wound to the left shoulder, with the caption: "All these sins and God still not ready fa [for] me yet."





31

Fox checked into the ER under the fake name "Michael Smith." To further conceal the true source of his injury, Fox told the hospital staff that he was shot around 65th Street and University. Shot Spotter recorded a gunshot at that location while Fox was en route from Ardaries Harris's apartment to the ER.

After dropping Fox off at the ER, Ardaries Harris and Xavier Harris are seen on pole camera footage outside Ardaries Harris's apartment with the Nissan Maxima (the car used to commit the May 2024 robberies). Ardaries Harris removed the license plate of the Nissan Maxima and Xavier Harris wiped down the trunk area.

## IV.    COCONSPIRATOR STATEMENTS

The government has described examples of the coconspirator statements it seeks to admit at trial in Section III above. The above-referenced text and social media messages, videos, and other statements made by defendants and their coconspirators, which all concern the commission of the charged robberies, were clearly in furtherance of the conspiracy charged in Count One. Thus, under the case law summarized above, all such statements are properly admitted at trial as coconspirator statements under Fed. R. Evid. 801(d)(2)(E).

In addition, many of the statements identified above are independently admissible and do not require a Rule 801(d)(2)(E) analysis. For example, statements made by defendants during the commission of the charged robberies constitute verbal acts that are admissible to show they were spoken, and not for the truth of the matter asserted. Further, multiple statements identified above do not constitute hearsay because they are suggestions, questions, offers, or demands—in other words, they do not make any truth claims. Such statements may be offered simply to show, for

32

instance, the existence, the illegality, or the nature or scope of the conspiracy, without requiring admission under the coconspirator exception.

## V.  CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as similar coconspirator statements, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

By:  */s/ Emily C.R. Vermylen*
EMILY C.R. VERMYLEN
STEPHANIE STERN
JALAN JASKOT
Assistant United States Attorneys
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300