**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 24-cr-00236 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ARDARIES HARRIS, JORDAN FOX, | ) | |
| ROOSEVELT VEAL, and XAVIER HARRIS | ) | |

**MEMORANDUM OPINION**

Defendants Ardaries Harris, Jordan Fox, Roosevelt Veal, and Xavier Harris have been indicted together for offenses associated with a series of armed robberies in the Chicago area between August 2023 and May 2024. The Superseding Indictment contains 23 counts, including one count of conspiracy to commit robberies affecting commerce, in violation of 18 U.S.C. § 1951; twelve counts of robbery affecting commerce, in violation of 18 U.S.C. § 1951(a); and ten counts of using a firearm during a robbery affecting commerce, in violation of 18 U.S.C. § 924(c)(1)(A). Fox is the only Defendant charged in all 23 counts. Veal is named in the conspiracy count (Count 1), seven robbery counts (Counts 3, 7, 9, 11, 13, 14, 16), and six firearm-related counts (Counts 4, 8, 10, 12, 15, 17). Fox and Veal each have filed motions to suppress evidence recovered pursuant to search warrants obtained by law enforcement during the investigation of the alleged robberies.[1] (Dkt. Nos. 222, 228, 229, 230, 233, 234, 235.) For the reasons that follow, those motions are denied.

---

[1] Although represented by counsel, the Court granted Veal leave to file his suppression motions *pro se*. (3/13/2026 Minute Entry, Dkt. No. 218.)

**DISCUSSION**

With their motions, Veal and Fox contend that certain search warrants issued in connection with the investigation of this case were not supported by probable cause. As a result, they argue, the evidence obtained during the ensuing searches must be suppressed as remedies for the claimed violations of their Fourth Amendment rights.

"A search warrant affidavit establishes probable cause when 'it sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.'" *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008). "[T]he task of the issuing magistrate [judge] is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* "The law affords 'great deference' to the probable cause finding made by the judge who evaluated the warrant application in the first instance." *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1057 (7th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). Thus, this Court "defer[s] to the issuing judge's initial probable cause finding if there is 'substantial evidence in the record' that supports" the decision. *Sims*, 551 F.3d at 644; *see also Gates*, 462 U.S. at 236 ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. . . . [T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.").

"The exclusion of evidence for a violation of the Fourth Amendment is a judicial remedy intended to deter police misconduct and thereby protect Fourth Amendment rights." *United States v. Matthews*, 12 F.4th 647, 652 (7th Cir. 2021). Thus, under the good-faith exception to the exclusionary rule, evidence obtained in violation of the Fourth Amendment may nonetheless be admissible if the officer who conducted the search reasonably relied on a warrant. *Id.* "The determination of reasonableness, and therefore good faith, is an objective inquiry." *Id.* at 653. Courts "presume that an officer with a warrant was acting in good faith, and the defendant's burden is to rebut that presumption." *Id.* This burden is "heavy by design," because "an officer cannot ordinarily be expected to question a judge's probable cause determination." *Id.* (internal quotation marks omitted). Accordingly, to overcome the presumption that an officer with a warrant acted in good faith, "a defendant must establish one of four situations":

> (1) the affiant misled the magistrate with information the affiant knew was false or would have known was false but for the affiant's reckless disregard for the truth; (2) the magistrate wholly abandoned the judicial role and instead acted as an adjunct law-enforcement officer; (3) the affidavit was bare boned, "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) the warrant was so facially deficient in particularizing its scope that the officers could not reasonably presume it was valid.

*Id.* As a general rule, "[l]ess proof is required to permit good-faith reliance than to demonstrate probable cause to search a location in the first instance." *Id.* at 655. The Court "look[s] only for 'indicia' of probable cause." *Id.*

## I.      Veal's *Pro Se* Motions

Veal has filed three motions to suppress. With each motion, he challenges the validity of a search warrant.[2] For each, the Court finds that the warrant was supported by probable cause, and even if it were not, the good-faith exception would apply.

### A.      April 2, 2024 Warrant

First, Veal argues for suppression of call detail records and historical cell-site location information ("CSLI") associated with a cellphone number that belonged to Veal, 312-818-9983, during the period August 17, 2023 to February 5, 2024.[3] (Veal's Mot. to Suppress Cell Number 312-818-9983, Dkt. No. 230.) A warrant issued on April 2, 2024 authorized law enforcement to search for this data. In the affidavit supporting the warrant application, Adam Fitzgerald, a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), stated that law enforcement was investigating "a series of nighttime armed robberies of liquor or convenience stores." (Affidavit ¶ 19, Ex. A to Govt's Resp. to Veal's Mot. to Suppress (hereinafter, "April 2, 2024 Affidavit").) The affiant identified "approximately forty-six robberies suspected to have been committed by some or all members of the same robbery crew from approximately September 2023 through January 2024." (*Id.*)

Having reviewed the April 2, 2024 Affidavit, the Court finds that it contained sufficient support for the magistrate judge's finding of probable cause to believe that the search of Veal's CSLI and call records from August 17, 2023 to February 5, 2024 would uncover evidence of a crime. To begin, the affiant described how he reviewed evidence obtained through the

---

[2] Veal did not attach the challenged warrants and affidavits to his motions to suppress. However, the Government submitted them along with its response to Veal's motions.

[3] For present purposes, Veal does not contend that the cell-phone number did not belong to him or that the affidavit offered in support of the warrant failed to establish probable cause that it did.

4

investigation of the robberies, including "the reports and statements of law enforcement agents and officers; jail recordings; forensic evidence; the statements of witnesses; law enforcement databases; physical evidence; court records; social media; and surveillance video." (*Id.* ¶ 19 n.1.) He further stated that based on his training and experience he had gained familiarity with wireless phone provider T-Mobile, and social media platforms Instagram, Facebook, and YouTube. (*Id.* ¶¶ 5–18.) He also stated that he reviewed photographs of Veal and his alleged coconspirators, Orlando Lofton, Jr., Fox, and Ardaries Harris, from an Illinois Secretary of State database. (*Id.* ¶ 21.)

Relying on these and other identified sources of information, the affiant presented evidence linking Veal to the robbery of Jerusalem Liquor on October 14, 2023, including that (1) Veal's forehead tattoo and voice resembled those of one of the Jerusalem Liquor robbers and (2) photos posted to Instagram depicted him "holding a firearm with unique scratches that resemble the scratches on a firearm used during the" Jerusalem Liquors robbery. (*Id.* ¶ 29.) The affiant also stated that a photo posted to Fox's Instagram account on October 15, 2023 depicted Veal wearing "black Nike Air Jordan retro low top sneakers that resemble the sneakers that a robber wore during approximately eleven (11) liquor store robberies between October 14, 2023 to October 25, 2023." (*Id.* ¶ 118.) Additionally, "on January 16, 2024, the Veal Instagram Account posted a photograph of the alleged co-conspirators Fox, Lofton Jr., Ardaries Harris, and Veal holding firearms and large amounts of cash." (*Id.* ¶ 112.) Notably, the affiant provided evidence that Ardaries Harris, Fox, and Lofton Jr. were involved in multiple gas station and liquor store robberies throughout the period covered by the warrant, including robberies occurring on November 6, 2023, January 11, 2024, and January 15, 2024. (*See, e.g.*, *id.* ¶¶ 20, 27, 56, 91, 93.) For example, the affiant stated that Ardaries Harris, who was pictured on Instagram next to Veal

with firearms on January 16, 2024, "has the same scarring on his right hand as one of the robbers who committed the January 15, 2024 robbery of DD Liquors." (*Id.* ¶ 28.)

Veal argues that the time period covered by the warrant was overbroad—that is, although there may have been probable cause with respect to the Jerusalem Liquors robbery, the affidavit did not establish probable cause to believe that he was involved in the other robberies under investigation. And indeed, "[w]arrants that are overbroad, that is, that allow officers to search for items that are unlikely to yield evidence of the crime, violate the Fourth Amendment." *United States v. Vizcarra-Millan*, 15 F.4th 473, 502 (7th Cir. 2021). "Balancing these concerns is highly fact- and context-specific." *Id.*

Here, there was a substantial basis for the issuing magistrate judge to find probable cause that a search of Veal's call records and CSLI throughout the entire period sought would reveal evidence associated with the conspiracy described in the affidavit. *See United States v. Jackson*, No. 20-CR-0229-BHL, 2023 WL 3302174, at *5 (E.D. Wis. May 8, 2023) (concluding that a warrant with "no timeframe for the search of the [defendant's] electronic devices" was not overbroad where the affidavit included factual assertions that, prior to the human trafficking incident under investigation, the defendant was "involve[d] with other women who lived in [the defendant]'s home and who gave 'random guys' massages" and the victim of the incident reported that the defendant "told her she needed to 'mak[e] money for the team'"). Although the affiant's proof of Veal's personal participation in robberies was strongest as to the Jerusalem Liquor robbery in October 2023, the affiant also provided strong evidence of Veal's participation in a conspiracy to rob liquor stores throughout the entire period. Additionally, the affiant described how all of the robberies under investigation followed a similar pattern: the robberies occurred in the Chicago area, mostly in the northwest region, and involved a robbery crew of two

to four individuals who generally used semi-automatic firearms with extended magazines and "switches" who entered liquor stores or convenience stores with their weapons drawn. (April 2, 2024 Affidavit ¶ 33.) Regardless of whether this pattern rises to the level of *modus operandi* evidence, it was properly before the issuing magistrate judge along with the other circumstantial evidence tying Veal to a broader conspiracy, such as the photographs of him with weapons and cash the day after three robberies allegedly carried out by his alleged co-conspirators. *See United States v. Carmel*, 548 F.3d 571, 575 (7th Cir. 2008) ("Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant.").

Additionally, the April l2, 2024 Affidavit sought "information both before and after the robberies to allow law enforcement to gain information regarding any advance preparation work for the robberies and to gain information regarding efforts to conceal the robberies." (*Id.* ¶ 136.) Viewing the affidavit as a whole, there was substantial evidence supporting the issuing magistrate judge's finding of a reasonable probability that a search of CSLI associated with Veal's phone number from August 17, 2023 to February 5, 2024 would uncover evidence of crimes in which Veal was involved. In any case, even if the warrant were overbroad, the affidavit was not so lacking in evidence particular to Veal throughout the timeframe as to prevent the executing officers from relying on it in good faith. *See, e.g.*, *United States v. Ray*, 541 F. Supp. 3d 355, 396–97 (S.D.N.Y. 2021) (rejecting the defendant's argument that a warrant for six years of CSLI was overbroad where the affidavit "laid out a complex course of criminal conduct that extended over years," and even if the warrant was overbroad, the officers had relied on it in good faith).

### B.     November 14, 2024 Warrant

Second, Veal seeks to suppress evidence obtained pursuant to a warrant issued on November 14, 2024 for call detail records and historical CSLI for the cell number 773-993-7848 for the time period May 1, 2024 through May 18, 2024. (Veal's Mot. to Suppress Cell Number 772-998-7848, Dkt. No. 229.) His arguments with respect this warrant are similar to those raised against the April 2, 2024 warrant.

The November 14, 2024 warrant was also issued based on an affidavit from Special Agent Fitzgerald. Contrary to Veal's contention that the affidavit was "barebones," it included over 100 pages of details from the affiant's investigation of numerous robberies believed to have been perpetrated as part of a conspiracy involving Veal, Fox, Ardaries Harris, Xavier Harris, and others. In a section titled "Identification of Roosevelt Veal as a Suspect," the affiant provided evidence indicative of Veal's personal involvement in multiple robberies as well as the broader conspiracy. This section included the evidence described in the April 2, 2024 Affidavit. The affiant also added evidence discovered subsequent to the April 2, 2024 Affidavit, such as call record details between Veal, Fox, Lofton, and Ardaries Harris from July 2023 to January 2024 (Affidavit ¶¶ 123–124, Ex. B to Govt's Resp. (hereinafter, "November 14, 2024 Affidavit")) and cell-site data placing Veal, Ardaries Harris, Fox, and Lofton in the vicinity of three robberies on January 15, 2024 (*Id.* ¶¶ 125–127).

The affiant next provided the details of several additional robberies between May 3, 2024 and May 9, 2024, as well as voluminous evidence offered to support a finding of probable cause that Veal, Harris, and Fox were involved in a conspiracy to commit those robberies. That evidence included the following: (1) like the prior robberies linked to this alleged conspiracy, these robberies involved three to four armed robbers entering liquor stores or gas stations in the

Northwest Chicago area at night; (2) a robber in a May 4 robbery used the same distinctive phrase, "drop money," as the robber in the January 15, 2024 robbery of Mr. P Beverage Depot (November 14, 2024 Affidavit ¶ 131); (3) Ardaries Harris was recorded by a pole camera entering his residence at 3:50 a.m. on May 4, 2024—2.5 hours after a robbery—wearing "a similar blue jacket with white sleeves as the jacket worn by one of the robbers of the Nobleman Pub" (*Id.* ¶ 135); (4) numerous interactions between "the A. Harris Phone and" Veal's phone number, 773-993-7848, "on May 3, 2024, including multiple apparent three party conversations between the A. Harris Phone," Veal's phone, and another alleged co-conspirator's phone, as well as numerous interactions between Ardaries Harris's, Fox's, and Xavier Harris's phones (including multi-party calls) on May 1, 2024 and May 5, 2025 (*Id.* ¶¶ 180–81); (5) clothing and robbery proceeds (namely, the same bottle of liquor stolen from one of the robberies) found in Ardaries Harris's apartment unit on May 11, 2024 (*Id.* ¶ 138.) The affiant also detailed that Ardaries Harris, Fox, and Veal had been arrested on May 11, 2024, but Xavier Harris was not in custody. Thus, law enforcement sought cell phone data as to the subject phones through May 18, 2024 "to ascertain any steps [Xavier Harris] may have taken to conceal the robberies or his participation in the robberies after the May 11, 2024 arrest of Veal, Fox, and [Ardaries] Harris." (*Id.* ¶ 187.)

The evidentiary showing in the November 14, 2024 Affidavit was sufficient to support the issuing magistrate judge's probable cause finding. While Veal is correct that the affiant did not provide evidence directly placing Veal at the scene of the May robberies under investigation, such evidence was not required to establish a reasonable likelihood that a search of Veal's CSLI for the time period surrounding those robberies would uncover evidence of his involvement in a conspiracy to commit them. In other words, the affiant provided sufficient evidence that (1) Veal

was involved in a conspiracy with Ardaries Harris, Fox, and Xavier Harris to rob liquor stores in the Chicago area, and (2) Veal's co-conspirators were identified as robbers on the scene of multiple robberies in the May date range. Moreover, the manner of those robberies was similar to that of the Jerusalem Liquors robbery, as to which the affiant provided significant evidence of Veal's involvement. Thus, there was a substantial evidentiary basis for the magistrate judge's finding of probable cause as to the November 14, 2024 warrant.

### C. December 24, 2024 Warrant

In his third motion to suppress, Veal seeks the suppression of DNA evidence gathered from a buccal swab authorized by a warrant issued on December 24, 2024. (Veal's Mot. to Suppress Buccal Swab, Dkt. No. 228.)

Regardless of whether the December 24, 2024 warrant was supported by probable cause, the Government could constitutionally take a buccal swab without a warrant once Veal was in custody pursuant to a grand jury indictment. *See United States v. Schreiber*, 866 F.3d 776 (7th Cir. 2017). In *Schrieber*, the defendant was arrested for robbing a liquor store. *Id.* at 777. Months after he was indicted by a grand jury for the liquor store robbery, and while he was in custody awaiting trial on that charge, authorities took a DNA buccal swab from him. *Id.* Officers then inputted the DNA sample into a database, which "linked him to a 2011 bank robbery." *Id.* In a motion to suppress the DNA evidence in his subsequent prosecution for the 2011 bank robbery, the defendant argued that "the state authorities had lacked probable cause to arrest him for the 2011 liquor store robbery and that the buccal swab was the fruit of that illegal arrest." *Id.* The Seventh Circuit rejected his argument. First, it noted Supreme Court cases holding that (1) "a buccal swab taken by state authorities after a determination of probable cause does not violate the Fourth Amendment," and (2) "a grand jury indictment conclusively establishes probable

10

cause." *Id.* at 782 (citing *Maryland v. King*, 569 U.S. 435, 465–66 (2013); *Kaley v. United States*, 571 U.S. 320, 327–28 (2014)). The Seventh Circuit went on to conclude that probable cause for the defendant's arrest was established by the grand jury's indictment, and therefore police could take his buccal swab after his valid arrest. *See id.* at 778 ("We now conclude that the district court correctly held that police may take a buccal swab after an arrest supported by probable cause and that a grand jury's issuance of an indictment is conclusive on the question of probable cause.").

The same reasoning applies here. Veal was arrested on May 11, 2024 and remained in federal custody thereafter. (5/13/2024 Order, Dkt. No. 12.) On May 20, 2024, a grand jury returned an indictment charging Veal, Fox, and Ardaries Harris with three counts of robbery related to robberies on January 15, 2024, related firearms charges, and a conspiracy to commit those robberies and several others between November 2023 and May 4, 2024. (Indictment, Dkt. No. 24.) In December 2024, the Government applied for and was granted a warrant to conduct the contested buccal swab. Even if the warrant were invalid, the subsequent buccal swab—which occurred months after Veal's arrest pursuant to the grand jury indictment—did not violate the Fourth Amendment. In attempting to avoid this conclusion, Veal argues that the Supreme Court's holding in *Maryland v. King* that buccal swabs after an arrest are reasonable "is only for booking procedures, when a person first gets arrested." (Veal's Reply at 3 of 10, Dkt. No. 272.) However, the Seventh Circuit rejected this distinction in *Schreiber*, in which "the buccal sample was taken from [the defendant] after he had been in custody for several months." *Schreiber*, 866 F.3d at 780 n.7 (acknowledging that "in *King*, the sample was taken at the time the defendant was booked," and holding that "as long as the swab occurs after a probable cause determination, the timing is otherwise irrelevant").

11

**D.** **The Good-Faith Exception Applies for All Three Warrants**

As noted above, the officers who executed the warrants Veal challenges are presumed to have acted in good faith because they sought warrants for the various searches. Thus, even if the warrants were deemed invalid by this Court, Veal would bear the heavy burden of rebutting the presumption of good faith. And he has not shown any of the grounds necessary to rebut that presumption. Each warrant contained sufficient evidence to support the issuing magistrate judge's probable cause findings. Whether an affidavit contains sufficient "indicia of probable cause" as to justify an officer's reliance on the warrant is an even lower standard than that which applies to the court's probable cause findings. *See Matthews*, 12 F.4th at 655 ("Less proof is required to permit good-faith reliance than to demonstrate probable cause to search a location in the first instance.").

Veal offers only conclusory arguments in support of his challenge. *See United States v. Woodfork*, 999 F.3d 511, 520 (7th Cir. 2021) (applying good-faith exception where, "aside from criticizing the lack of detail in [the investigator's] testimony," the defendant offered no evidence to rebut the presumption of good faith). As to each warrant, his primary arguments are essentially that the investigating agents acted recklessly by submitting affidavits that lacked probable cause as to him, and that the magistrate judges abandoned their neutral and detached roles by signing unsupported warrants. However, the officers' decisions to seek warrants support a presumption of good faith. Even the April 2, 2024 Affidavit—the earliest-submitted affidavit challenged by Veal, which contained the least information about the investigation—was far from "barebones." To the contrary, it contained highly detailed facts about Veal's direct participation in certain offenses, his ties to other alleged co-conspirators, and details linking the conspiracy to other robberies. An officer was entitled to rely on that warrant—as well as the other two

12

challenged warrants—because of the high amount of particularized detail in each warrant affidavit. Beyond mostly conclusory argument, Veal has made no showing to the contrary.[4]

## II.     Fox's Motions

Initially, Fox filed a single motion to suppress three categories of evidence: (1) social media content, (2) a firearm recovered during his arrest, and (3) CSLI data from two of his cellphones. (Fox's Mot. to Suppress, Dkt. No. 222.) He subsequently made an "amended" filing breaking up his single motion into three amended motions—one for each category of evidence. (Mot. to Suppress Social Media Content, Dkt. No. 233; Mot. to Suppress Firearm, Dkt. No. 234; Mot. to Suppress Social Media Content, Dkt. No. 235.) The Government then filed a response to Fox's original motion to suppress, and Fox filed a reply. (Govt's Resp. to Def. Fox's Mot. to Suppress, Dkt. No. 237; Def.'s Reply Supp. Mots. to Suppress, Dkt. No. 240.) At a hearing on April 10, 2026, Fox's counsel informed the Court that the original motion and amended motions to suppress were substantively identical, and that the amended motions were filed solely for stylistic reasons. (*See also* Fox's Mot. for Leave to Amend Mot. to Suppress ¶ 11, Dkt. No. 232 ("[T]he motion to amend seeks only to expand and clarify arguments already presented.").) The Government and Fox therefore agreed that Fox's suppression motions were fully briefed based

---

[4] The Court notes that Veal's motions include requests for evidentiary hearings and *Franks* hearings. Those requests are denied. "Evidentiary hearings on motions to suppress are not granted as a matter of course." *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). "District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). Veal has not pointed to any disputed issues of material fact in his motions. All his suppression arguments concern whether the affidavits offered sufficient evidence to support probable cause, and the Court has reviewed those affidavits in deciding his motions. Accordingly, the Court sees no reason to conduct an evidentiary hearing. "To obtain a *Franks* hearing, the defendant must make a 'substantial preliminary showing' of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth." *Woodfork*, 999 F.3d at 517. "Franks hearings are 'rarely held' because '[t]hese elements are hard to prove.'" *Id.* Veal has shown neither of them.

on the response and reply that had been filed. Based on these submissions and the parties'

representations, the Court grants Fox's motion for leave to amend his motion to suppress (Dkt.

No. 232). However, given that the Government's response and Fox's reply are based on the

initial motion, and also because Fox appears to have mistakenly omitted his arguments for

suppression of CSLI from his amended motions,[5] the Court considers Fox's suppression motions

(Dkt. Nos. 222, 233–235) as a single, cumulative submission.

Fox's motions ask the Court to suppress "all cell site information obtained pursuant to the

warrants issued in this case," "all social media and digital content, including but not limited to

YouTube and other online social media materials, obtained because of the warrant," and "the

firearm recovered at the time of [Fox's] arrest." (Fox's Mot. to Suppress at 11, Dkt. No. 222.) In

seeking suppression of these items, Fox argues that various warrants were not supported by

probable cause. He does not, however, identify the particular warrants he is challenging, and

instead refers vaguely to "the warrant" or "the warrants" throughout his filings. The exhibits to

his motions do not help. He has submitted three exhibits: an arrest report, indictment, and an

excerpt of an affidavit identifying him as a suspect.[6] These exhibits are attached to the Motion to

Suppress Social Media Content, Docket Number 233. However, given that the probable cause

determination is based on the affidavit as a whole, the Court cannot review the issuing magistrate

judge's decision based on an affidavit excerpt alone.

---

[5] The filings at Docket Numbers 233 and 235 are both titled "Motion to Suppress Social Media Content" and are identical documents. Meanwhile, none of Fox's amended motions to suppress address the CSLI that he sought to suppress in his original motion. It appears that Fox mistakenly filed the "Motion to Suppress Social Media Content" twice and omitted an amended motion to suppress CSLI. (*See* Fox's Mot. for Leave to Amend Mot. to Suppress ¶ 10 (seeking suppression of "the firearm evidence, social media evidence, and CSLI evidence").)

[6] The excerpted portion is a section of the affidavit titled "Identification of Jordan Fox as a Suspect" at pages 40 to 56.

In response to Fox's motions, the Government points out that Fox does not identify a specific warrant. The Government therefore "presumes for the purposes of its response" that Fox's motion concerns (1) two search warrants issued on April 2, 2024 for CSLI associated with two phone numbers believed to have been associated with Fox, and (2) two search warrants issued on April 8, 2025 for location data, identifying information, and similar evidence from Fox's Facebook and Instagram accounts. (Govt's Resp. at 2, Dkt. No. 237.) In his reply brief, Fox does not expressly state whether he agrees with the Government's focus on the April 2, 2024 and April 8, 2025 warrants. However, he does state that "[t]he Government's response confirms the central defect that was addressed in Mr. Fox's original motions: the warrants at issue were not supported by probable cause linking Mr. Fox to the charged robberies." (Fox's Reply at 1, Dkt. No. 240.) Based on this record, the Court understands Fox to be challenging the April 2, 2024 and April 8, 2025 warrants identified by the Government. The Court therefore focuses its consideration on those warrants. *Cf. United States v. Wood*, 16 F.4th 529, 537 (7th Cir. 2021) (explaining that "[w]hen defense counsel fails to develop a suppression argument" the defendant "bypasse[s] an opportunity to challenge [contested] searches, which, without good cause, . . . result[s] in forfeiture").

### A.     Suppression of CSLI: April 2, 2024 Warrants

The Court begins with Fox's motion to suppress CSLI gathered pursuant to the April 2, 2024 cell-data warrants. These warrants relied on the same affidavit from Special Agent Fitzgerald that Veal challenged. The Government applied to obtain CSLI from August 17, 2023 to February 5, 2024 to assist in its investigation of dozens of robberies between September 7, 2023 and January 15, 2024. The Government was granted two warrants for cell data related to

Fox—one for each phone number attributed to him.[7] Because the same affidavit was used for each warrant, the Court considers the warrants together.

The Court first finds that the affidavit provided a substantial basis for the issuing magistrate judge's determination that probable cause existed that searches of CSLI associated with both of Fox's alleged phone numbers would yield evidence of the crimes alleged. The affidavit included significant evidence linking Fox to various robberies under investigation. First, the affiant provided evidence that a firearm with a distinctive red-and-white "Supreme" sticker on an extended magazine was held by a participant in one of Fox's music videos posted to YouTube, and that a similar firearm with a similar sticker was used by a robber in the October 7, 2023 robberies of R&J Food and Liquor and Liquor Max and the November 21, 2023 robbery of Gold Star Liquor. (April 2, 2024 Affidavit ¶¶ 68–72.) Second, a photograph posted to Fox's Instagram account on January 19, 2024 showed Fox wearing distinctive "Supreme" underwear that matched the underwear worn by one of the Gold Star Liquor robbers. (*Id.* ¶¶ 74–76.) Third, the affiant compared footage of an interview of Fox posted to YouTube with surveillance footage from the October 14, 2023 robbery of EZT Mart and found that "a robber appearing to have similar physical demographics as Fox entered the store armed with a firearm and demanded money from the EZT Mart employee" and "asked multiple times where the drop money was," with a "voice [that] resembled the voice of Fox." (*Id.* ¶ 77.) Fourth, the affiant stated that Fox's DNA, which was in a law enforcement database from a previous conviction, returned a "moderate stringency match" with DNA recovered from a backpack used in a robbery of California Food & Liquors on November 6, 2023. (*Id.* ¶¶ 78–81.)

---

[7] For present purposes, Fox does not dispute that each phone number was linked to him.

The affiant also provided evidence linking Fox to a broader conspiracy involving night-time robberies of liquor stores, involving two to four robbers using similar firearms, in the Chicago area, from September 2023 to January 2024. For instance, Fox was pictured with Veal, Fox, Ardaries Harris, and Lofton holding firearms and large amounts of cash in photographs posted to Veal's Instagram account on January 16, 2024—one day after the robberies of Mr. P Beverage Depot, Before You Go Liquor, and Clybourn Market. (*Id.* ¶¶ 109–112.) Fox insists that photos of him with alleged co-conspirators are insufficient to establish probable cause. Such photos, he argues, amount to nothing more than "guilt by association." Far from relying on mere association, however, the affiant provided numerous pieces of evidence linking Fox himself to multiple robberies that were conducted in a similar manner between September 2023 and January 2024. Moreover, a photo of four individuals carrying weapons and cash the day after three robberies to which some of those individuals are tied supports an inference of more than mere association. *Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision . . . given all the circumstances set forth in the affidavit before him . . . .").

Fox also argues that the Government's warrant application for CSLI from Fox's phones did not contain sufficient "particularized evidence tying [Fox] to the charged offense." (Fox's Mot. to Suppress ¶ 5, Dkt. No. 222.) But as noted above, the Government provided significant evidence linking Fox to both the conspiracy and specific robberies. Whether a given offense that was under investigation was later charged in an indictment is not relevant to the issuing magistrate judge's probable cause determination.

**B.      Suppression of Social Media Content: April 8, 2025 Warrant**

Fox also seeks suppression of "all social media and digital content, including but not limited to YouTube and other online social media materials, obtained because of the warrant." (Mot. to Suppress, Prayer for Relief, Dkt. No. 233.) Although Fox's motion does not state to which warrant he is referring, the Government understands him to be challenging two warrants to search information related to his Facebook and Instagram accounts (*e.g.*, location and identifying information) on April 8, 2025. By that date, Fox was in federal custody after having been indicted by a grand jury for three robberies, and law enforcement officers were continuing to investigate numerous robberies.

The Court finds that the affidavit submitted in support of the April 8, 2025 warrants was supported by probable cause. This affidavit was submitted by Special Agent Fitzgerald and included much of the same information as provided in support of the April 2, 2024 warrant, as well as new information uncovered throughout the investigation. For example, the affidavit added evidence regarding another Chicago-area liquor store robbery on May 9, 2024. After two masked individuals entered the store, a shootout ensued between the cashier and one of the individuals. (Affidavit ¶ 58, Exs. C & D to Govt's Resp. to Fox's Mot. to Suppress (hereinafter, the "April 8, 2025 Affidavit").) About 30 minutes later, surveillance footage showed a vehicle with two individuals arrive at the residence associated with Ardaries and Xavier Harris. (*Id.* ¶ 59.) An individual exited the vehicle and entered the residence. (*Id.*) Minutes later, a vehicle registered to Fox arrived, and Fox "proceeded to exit the residence wearing a white T-shirt with an apparent blood stain on the right shoulder area." (*Id.* ¶ 60.) Five minutes later, surveillance footage at the University of Chicago hospital showed him entering the emergency room. (*Id.* ¶ 61.)

18

At times, Fox suggests that, rather than challenging the April 8, 2025 warrant itself, he actually takes issue with the Government's reference to photos or videos posted on social media as support for probable cause in connection with *any* warrant affidavit. He argues that the social media content did not support probable cause determinations because the Government's primary uses of such content in the affidavits was (1) to show pictures of the alleged robbery crew together, and (2) to link Fox to specific robberies by matching his clothing in social-media photos with the robbers' clothing. In taking this approach, however, Fox effectively asks the court to isolate certain categories of evidence—in this case, *all* social media content—as categorically irrelevant. However, "[r]ather than viewing bits and pieces of a probable cause showing in isolation, the court must focus on all the facts presented to the magistrate." *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993). As discussed above, the social media content cited in the affidavits—for example, photographs of the alleged robbery crew with firearms and large amounts of cash shortly after an alleged robbery—contributed to the affiants' establishment of probable cause. On a motion to suppress evidence pursuant to the Fourth Amendment, the Court must take the affidavits as a whole, not parse out individual pieces of evidence.

In short, Fox argues that he should not be "penalized merely [f]or posting on social media and associating with friends that he lives in the same neighborhood with, that would be guilty by association." (Fox's Mot. to Suppress Social Media Content at 8, Dkt. No. 233.) But, in fact, the affidavits provided far more evidence of Fox's involvement in various robberies than just photographs showing association with friends.

### C.    Suppression of the Firearm

Fox also moves for suppression of a firearm that was recovered during his arrest. As Fox explains, on May 11, 2025, law enforcement officers arrested him "on an active Federal arrest warrant for Armed Robbery at 440 E 87th Pl Chicago, IL after being involved in a motor vehicle crash with an unmarked Chicago Police vehicle." (Fox's Mot. to Suppress Firearm ¶ 2, Dkt. No. 234.) During the arrest, he "was observed to exit his vehicle and drop to the ground a loaded Glock semi-auto pistol and fled on foot." (*Id.*) Law enforcement recovered the firearm and arrested him. In grand jury proceedings, the Government "allege[d] that this firearm [was] connected to certain prior incidents." (*Id.*) The Government "also relie[d] on cell site location information surveillance footage, and social media content as part of its investigation." (*Id.*)

Fox argues that the firearm should be suppressed because of various defects in "the warrants." (*Id.* ¶ 3.) He first contends that "the warrant applications fail to provide particularized facts linking [him] to the alleged criminal activity, instead relying on generalized suspicion based on association and proximity, and the Government is attempting to cure these deficiencies through after-acquired evidence." (*Id.* ¶ 5.) The Court has now reviewed and found valid every warrant submitted for its consideration. All of those warrants were search warrants; Fox has not supplied the arrest warrant for court review.

Fox also argues that "[t]he Government's theory depends on using evidence obtained after the warrants were issued to strengthen the connection between Mr. Fox and the alleged robberies, but probable cause must be assessed based solely on the information presented to the magistrate at the time of issuance, and later acquired evidence cannot cure a deficient warrant." (*Id.* ¶ 7.) The relevance of this argument for purposes of suppressing the firearm is unclear. Contrary to Fox's suggestion, the Government's arguments against suppression rely entirely on

20

statements made in the warrant affidavits. Finally, Fox argues that the Government's "use of th[e] firearm" to "connect [Fox] to numerous prior robberies spanning several months . . . represents a significant expansion beyond the probable cause underlying the original warrant application." (*Id.* ¶ 11.) There is, however, no Fourth Amendment requirement that evidence recovered pursuant to a warrant be used to prove only those offenses listed in the warrant affidavit.

To the extent Fox seeks to challenge the seizure of the firearm as warrantless, the plain-view doctrine precludes suppression. Under that doctrine, "[a] warrantless seizure of an object is justified if: '(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was 'immediately apparent.'" *United States v. Schmidt*, 700 F.3d 934, 938–39 (7th Cir. 2012). First, Fox does not dispute that the officers recovered the firearm from the ground in plain view after he had fled. Second, the officers were lawfully present in the area, as they were executing an arrest warrant (and were apparently in a public roadway given that Fox had been involved in a vehicle accident with the officers). Finally, the incriminating nature of a fleeing arrestee's firearm would have been readily apparent to the officers, particularly where the suspected crime was armed robbery. Fox argues that the plain-view doctrine does not apply because the "the officers initiated their pursuit based on defective warrants." (Fox's Reply at 12.) However, as discussed above, Fox has not identified a defective warrant.

In short, Fox has not provided any ground for suppression of the firearm under the Fourth Amendment. Accordingly, the motion to suppress it is denied.

### D. The Good Faith Exception Applies

As discussed above, evidence should not be suppressed if officers reasonably relied on a facially valid warrant in discovering and seizing the evidence. All of the evidence Fox challenges was seized pursuant to a warrant, and therefore, the officers' good-faith is presumed. In response, Fox offers only conclusory arguments against application of the good-faith exception. First, he argues that "the affidavit relied on weak inferences and lacked individualized evidence connecting Mr. Fox to any charged robbery." (Fox's Reply at 10.) The Court has already rejected that argument above. Second, he argues that the warrants could not be relied on in good-faith because the affiants did not cite "basic investigative evidence," such as "any eyewitness identifying Mr. Fox, . . . statements placing him at any charged robbery, . . . forensic evidence linking him to a charged offense, [or] . . . surveillance where they found him participating in the alleged offenses." (*Id.* at 11.) Fox does not cite any case law requiring the use of certain investigative methods to support a finding of good-faith reliance on a warrant. In any case, the Government did rely on forensic evidence (such as DNA) and surveillance (such as pole camera footage). Whether the Government could have taken ***additional*** investigative steps before seeking a warrant is irrelevant where, as here, the affidavit includes sufficient indicia of probable cause to justify good-faith reliance on the warrant. Fox has failed to rebut the presumption of good faith. Accordingly even if the challenged warrants were defective, suppression would not be available to Fox.

**CONCLUSION**

For the foregoing reasons, Defendant Veal's motions to suppress (Dkt. Nos. 228, 229, 230) are denied. Defendant Fox's motion to suppress (Dkt. No. 222) and amended motions to suppress (Dkt. Nos. 233, 234, 235) are also denied.

ENTERED:

Dated:  June 5, 2026

Andrea R. Wood
United States District Judge

23